IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

GLEN ADKINS, JR.,           )
           )
        Petitioner,      )
           )
   v.            )     Case No. 23-3235-JWL
           )
C. CARTER, Warden, USP-Leavenworth,[1]  )
           )
        Respondent.   )
           )
_____)

## MEMORANDUM AND ORDER

Petitioner filed a *pro se* petition for habeas corpus under 28 U.S.C. § 2241, in which he claimed that he is entitled to receive certain additional credits against his sentence under the First Step Act (FSA). By Memorandum and Order of February 14, 2024, the Court partially denied the petition. *See Adkins v. Hudson*, 2024 WL 623996 (D. Kan. Feb. 14, 2024). The Court rejected petitioner's argument that he should receive credits at a higher rate retroactively after satisfying the statutory requirements for that rate; and the Court rejected petitioner's equal protection argument. The Court requested additional briefing, however, concerning the actual date when petitioner satisfied the statutory requirements for earning credits at the higher rate. Respondent filed an additional brief defending the calculation of petitioner's credits by the Bureau of Prisons (BOP). In his motion for reconsideration of the February 14, 2024, ruling (which motion the Court denied),

---

[1] The Court has substituted the new warden at petitioner's place of confinement as the proper respondent.

petitioner also included brief arguments concerning the proper trigger date for earning credits at the higher rate; but petitioner did not submit a supplemental brief by the Court's deadline of April 15, 2024. Having considered these additional arguments, the Court now **denies** the petition in its entirety.

## I.      Factual Background

Petitioner is presently serving a federal sentence of 300 months at the United States Penitentiary in Leavenworth, Kansas, within this judicial district. His anticipated release date is November 17, 2032. Since the FSA took effect on December 21, 2018, petitioner has been assessed by the BOP as having a low or minimum risk of recidivism. Under the FSA, petitioner has been awarded 10 days of Earned Time Credits (ETCs) for every 30 days of participation in approved evidence-based recidivism reduction (EBRR) programming during the period from December 21, 2018, to July 17, 2019; and he has been awarded 15 days of ETCs for every 30 days of EBRR programming after July 17, 2019.

With her supplemental brief, respondent submitted evidence establishing the following facts. After enactment of the FSA, the BOP originally calculated some prisoners' recidivism risk scores (per the PATTERN scoring system) manually, but the BOP developed an automatic risk score calculator, which was implemented beginning on April 28, 2021. Only those prisoners with imminent release dates had their PATTERN scores determined manually prior to launch of the automatic calculator. In order to mitigate any prejudice from the failure to determine a prisoner's score previously, for any prisoner whose score was calculated for the first time with the automatic calculator, that score was

applied retroactively for all periods prior to the April 2021 calculation, back to the FSA's effective date of December 21, 2018 (or, presumably, to the date of the prisoner's incarceration, if that occurred after the FSA's effective date).

Because of petitioner's release date, his PATTERN score was not calculated manually, and his score was first calculated on April 28, 2021.  Based on that score, petitioner was assessed to have a "low" risk of recidivism, and that score and assessment were "backdated" to apply to all assessments that petitioner would have had prior to April 28, 2021.  As respondent explains in his brief, the BOP's policy is that a prisoner receives an initial PATTERN score within 28 days after entering custody, and the prisoner's score is then calculated (and the recidivism risk reassessed) at least every 180 days thereafter (with that interval changing to 90 days within one year of projected release).  Thus, in petitioner's case, because he was already in custody when the FSA took effect, his initial "low" risk assessment was "backdated" to apply to the period from December 21, 2018, to January 18, 2019 (28 days later, by which date petitioner would have had his initial risk determination, if he had been taken into custody on the date of enactment of the FSA); and to the period from January 18, 2019, to July 17, 2019 (180 days later, when petitioner would have had his next assessment); and to all 180-day assessment periods thereafter prior to the automatic calculation on April 28, 2021.  Based on those periods, the BOP has awarded ETCs to petitioner for every 30 days of EBRR programming at the 10-day rate for the periods from December 21, 2018, to July 17, 2019; and at the 15-day rate thereafter. (Since his first automatic PATTERN score calculation, petitioner has been assessed as

either a "low" or "minimum" risk of recidivism in each reassessment.)  Petitioner has not disputed these facts about how the assessments periods were determined by the BOP.


II.     **Analysis of Petitioner's Proper Trigger Date for the 15-Day Rate**

As the Court explained in its prior opinion, the FSA charged the Attorney General to develop a system by which the BOP would assess each prisoner's risk of recidivism and provide incentives and rewards for each prisoner's participation in EBRR programming. *See* 18 U.S.C. § 3632(a).  ETCs represent one such reward.  *See id.* § 3632(d)(4).  Unless a prisoner is ineligible because he is serving a sentence for one of many specified offenses, *see id.* § 3632(d)(4)(D), the prisoner may receive credits to be applied toward time in prerelease custody or supervised release, *see id.* § 3632(d)(4)(C).  Most pertinent to this case is the FSA's provision that an eligible prisoner (such as petitioner) shall receive 10 days of ETCs for every 30 days of successful participation in EBRR programming; but "[a] prisoner determined by the [BOP] to be at a minimum or low risk of recidivating, who, over 2 consecutive assessments, has not increased their risk of recidivism, shall earn an additional 5 days of [ETCs] for every 30 days of successful participation in [EBRR] programming."  *See id.* § 3632(d)(4)(A).

As noted above, the BOP has credited petitioner with ETCs at the 15-day rate for his participation since July 17, 2019.  In its prior opinion, the Court questioned whether that was the correct trigger date, in light of an argument made by respondent in answer to the petition, as follows:

As noted above, the FSA states that "[a] prisoner determined by the [BOP] to be at a minimum or low risk of recidivating, who, over 2 consecutive assessments, has not increased their risk of recidivism, shall earn an additional 5 days of [ETCs] for every 30 days of successful participation in [EBRR] programming." *See id.* § 3632(d)(4)(A). The applicable regulation essentially parrots that same language without elaboration. *See* 28 C.F.R. § 543.42(c). Nor does the relevant BOP Program Statement (attached to the supporting declaration submitted by respondent) elaborate on the statutory language.

In his answer, respondent argues that a total of three favorable recidivism score calculations are required before a prisoner may earn at the 15-day rate, including an initial "determination" and two consecutive "reassessments". That position does not appear to comport with the language of the FSA, however. The statute requires the BOP initially to "determine" a prisoner's recidivism risk at intake. *See* 18 U.S.C. § 3632(a)(1). The statute then requires the BOP to "reassess" that recidivism risk periodically. *See id.* § 3632(a)(4). The use of the word "reassess" (instead of "assess") suggests that the initial "determination" constitutes a first "assessment" – which would mean that the requirement of two consecutive "assessments" for earning at the 15-day rate could refer to the initial determination and *one* reassessment. Respondent has not addressed this apparent tension between his position and the statute's use of "reassess". Nor do the BOP regulation and program statement address that exact issue, and thus the BOP's official interpretation is not clear.

With respect to application of the statute to petitioner specifically, respondent has conceded that petitioner was initially determined to be at a minimum or low risk of recidivism and that petitioner has received only minimum or low risk assessments since then. Neither respondent's answer nor the supporting declaration, however, identifies the exact dates of the BOP's risk assessments of petitioner (either his initial determination or any reassessment). Rather, they refer to petitioner's "assessment periods" (although the FSA does not refer to such periods), with the first such period running from December 21, 2018, to January 18, 2019, and the second such period running from January 18, 2019, to July 17, 2019. Those periods might indicate assessments performed on January 18, 2019, and July 17, 2019, in accord with the BOP's policy (noted within the supporting declaration) that a prisoner's initial risk determination is performed within 28 days of intake (or in this case, within 28 days of the effective date of the FSA) and reassessments are performed every 180 days. Thus, it may be the case that petitioner has been permitted to earn ETCs at the 15-day rate since achieving the second of two consecutive favorable assessments (consisting of one

5

initial determination and one reassessment) on July 17, 2019.  Again,
however, it is not clear if that is indeed the case, in light of respondent's
argument that *three* assessments or risk calculations are actually required in
[petitioner's] case before the 15-day rate may be triggered.

See *Adkins*, 2024 WL 623996, at *3 (footnote omitted).  The Court also included the

following footnote:

> The FSA requires both that the prisoner has been "determined" by the BOP
> to be at a minimum or low risk of recidivating and that the prisoner has
> maintained a minimum or low risk over the prisoner's two most recent
> consecutive assessments; but it does not state that the two consecutive
> assessments must be separate from and cannot include the "determination"
> of a minimum or low risk.  *See* 18 U.S.C. § 3632(d)(4)(A).  Indeed, if a
> prisoner was initially determined to be at a higher risk but then achieves
> minimum or low risk scores in subsequent reassessments, the statute would
> appear to allow the prisoner to earn at the higher rate from the date of the
> second reassessment, with one of those two reassessments providing the
> necessary "determination" of the required risk level.

See *id.* at *3 n.4.

In her supplemental brief, respondent again takes the position that a prisoner must

receive *three* favorable PATTERN score calculations, consisting of one "determination"

and two "reassessments".  Respondent has not addressed, however, the fact that the statute

refers to two consecutive "assessments" (not "reassessments") and does not prohibit

counting the initial determination as one of those two assessments, as the Court noted in

the excerpts above.  Nor has respondent addressed the Court's hypothetical situation

involving a prisoner who receives an initial (and perhaps subsequent) determination as a

high or medium risk, but then eventually receives two consecutive low-risk assessments;

in that case, it would appear that the statute would allow the prisoner to earn at the 15-day rate upon receiving that second consecutive low-risk assessment.[2]

Respondent argues that courts have consistently ruled in favor of an interpretation requiring three different favorable assessments, but the Court does not agree that the caselaw is especially helpful to respondent's position here.  For instance, in *Lallave v. Spaulding*, 2023 WL 5732702 (M.D. Pa. Aug. 9, 2023), cited by respondent, the court ruled that the BOP had calculated the prisoner's ETCs correctly by awarding at the higher rate after an initial favorable risk determination and then two subsequent assessments; but the court did not address this question whether the statute requires two or three favorable assessments.  *See id.*  Similarly, in *Hulse v. Lemaster*, 2024 WL 439445 (E.D. Ky. Jan. 16, 2024), cited by respondent, the court did not address this question of interpretation; and it is not clear whether the court required three separate assessments, as the court referred only to the prisoner's first two assessment "periods".  *See id.* at *1.

Other cases cited by respondent appear to undermine her argument that three "low" or "minimum" scores are required.  In *Laksonen v. Eischen*, 2023 WL 3072434 (D. Minn. Apr. 25, 2023), the prisoner arrived at the prison on April 6, 2022, was initially determined to have a low risk on April 27, 2022, received another low-risk determination on October 7, 2022, and received credits at the 15-day rate for programming after October 3, 2022 – and thus the court approved the use of the 15-day rate after *two* favorable scores.  *See id.*

---

[2] The Tenth Circuit recently noted that the use of dynamic or non-static factors in the BOP's risk assessment system provides a meaningful opportunity for prisoners to lower their scores and thus be assessed as having a low recidivism risk.  *See Green v. Hudson*, __ F.4th __, 2024 WL 960497, at *3-4 (10th Cir. Mar. 6, 2024).

at *2.  Respondent also relies on *Jun v. FPC-Duluth*, 2023 WL 5917739 (D. Minn. June 30, 2023), *report and recommendation adopted*, 2023 WL 5899128 (D. Minn. Sept. 11, 2023), but that case is even more damaging to respondent's position.  In *Jun*, the respondent warden first argued that a prisoner needs three low scores, consisting of the initial determination and two consecutive reassessments; and the respondent thus argued that the petitioner there – who arrived on June 20, 2022, had his initial determination of presenting a low risk on July 6, 2022, and had a first reassessment of being a "low" risk on December 21, 2022 – could not earn at the 15-day rate until after a second reassessment.  *See id.* at *10, 12.  The petitioner argued that three scores should not be required, as the initial determination should count as one of the two consecutive assessments required by the statute.  *See id.* at *10.[3]  The respondent warden then appeared to change his position, arguing instead that the prisoner had in fact begun receiving credits at the higher rate on January 14, 2023, with the first two assessments on June 20, 2022, and July 18, 2022.  *See id.* at *12.  The court observed, however, that there had been no June 20, 2022, assessment – rather, the petitioner's incarceration had begun on that date, and his July 6, 2022, assessment was effective on that date.  *See id.*  The court proceeded to find that the BOP had acted in conformity with the statute by applying the 15-day rate in January 2023, based

---

[3] The petitioner argued that the FSA's definition of "risk and need assessment tool" as a method to "determine" risk and programming, *see* 18 U.S.C. § 3635(6), indicates that the required two "assessments" may include the initial "determination".  *See Jun*, 2023 WL 5917739, at *10.

on *two* assessments (in July 2022 and December 2022).  *See id.* at *13 (citing *Laksonen*, in which the court similarly upheld the use of the 15-day rate after two assessments).[4]

The question is complicated here by the fact that petitioner (like many other prisoners) did not have his PATTERN score determined until April 2021, when the auto-calculation tool was launched, long after the enactment of the FSA.  The BOP attempted to address that delay by "backdating" that April 2021 score and applying it to all prior dates on which the prisoner would have had an assessment, back to the December 2018 date on which the FSA took effect.  In petitioner's case (and, it appears, in the case of other prisoners already incarcerated by that effective date), the BOP then takes the position that the petitioner's low score (actually calculated in April 2021) has been applied to the dates of December 21, 2018, January 18, 2019, and July 17, 2019 (and continuing every six months thereafter), with the 15-day rate applying after two assessment periods (and thus after the third of those dates).  That timeline is clearly intended to mirror the usual timeline under the statute and the BOP's policy (which would apply in the case of a prisoner first incarcerated after the FSA took effect), involving an initial determination within 28 days and then a first reassessment within 180 days.  Thus, the question practically becomes one of semantics concerning fictitious assessment dates: if petitioner had actually received assessments after the FSA took effect, presumably he would have had his initial

---

[4]  In the present case, respondent argues that this Court should follow other courts in adopting her three-score interpretation for the sake of uniformity among prisoners.  The warden's shifting positions in *Jun*, however, suggest that the BOP itself has not argued its position in a consistent manner.  At any rate, the Court's decision to uphold the BOP's application of the statute in the present case is consistent with these other cases that involve similar timelines.

determination within 28 days, by January 18, 2019, and his first reassessment by July 17, 2019, 180 days later; and thus, petitioner would have been allowed to earn at the 15-day rate after *two* presumed assessments (one initial determination and one reassessment).

Other cases cited by respondent involve this same timeline.  Thus, in *Sichting v. Rarden*, 2024 WL 586395 (D. Minn. Jan. 18, 2024), *report and recommendation adopted*, 2024 WL 580185 (D. Minn. Feb. 13, 2024), the court approved the BOP's use of the 15-day rate after assessments on December 21, 2018, January 18, 2019, and July 17, 2019 (the same assessments dates claimed by respondent here), although the court did not address this issue of the use of backdating based on an assessment that actually occurred much later with the auto-calculation tool.  *See id.* at 8-9 (citing, *inter alia*, *Jun*, 2023 WL 5917739, at *13).  Those same time intervals were applied in *Nicoletti v. Bayless*, 2023 WL 8369512 (N.D. W. Va. Dec. 4, 2023), *appeal filed* (4th Cir. Jan. 4, 2024), cited by respondent, in which the court approved an ETC calculation using the 15-day rate beginning after an auto-calculation was backdated to three dates: August 31, 2021, when the prisoner was first incarcerated; September 28, 2021 (28 days later), for a first assessment; and March 27, 2022 (180 days later), for a second assessment.  *See id.* at *3.  No doubt this timeline using such time intervals is why respondent initially spoke of "assessments periods" in the present case, as the BOP's policy appears to be to apply the 15-day rate after two such periods (with 28-day and 180-day intervals), even when the first period begins not with an actual assessment, but with the effective date of the FSA or with the prisoner's first day in custody.

The same time intervals may be found in *Padilla v. Segal*, 2023 WL 9197925 (D. Minn. Dec. 11, 2023), *report and recommendation adopted*, 2024 WL 129932 (D. Minn. Jan. 11, 2024), another case cited by respondent.  In *Padilla*, as recounted by the court, the prisoner was incarcerated beginning on October 27, 2022, had her initial low-risk determination on that date, and then had low-risk assessments on November 14, 2022 (within 28 days), and May 13, 2023 (180 days later).  *See id.* at *2.  The court did not discuss whether assessments *actually* occurred on those three dates, or whether there had been backdating after use of the auto-calculation tool.  *See id.*  Given the BOP's policy and respondent's briefs in the present case, however, it is likely that the prisoner in *Padilla* was credited at the 15-day rate after only two assessment dates under the BOP's policy – the initial determination within 28 days of incarceration and the first reassessment within 180 after that determination; and that the respondent in that case nonetheless referred to three total assessments, including one on the first day of incarceration – just as the respondent here had the backdated the auto-calculation score apply also to the first effective date of the FSA, with an assessment 28 days later.

In *Padilla*, the court did directly address whether the prisoner must receive a total of two or three low or minimum scores to earn ETCs at the 15-day rate.  *See id.* at *3.  There, as here, the respondent argued that the low score must be maintained over two consecutive assessments *after* the initial determination of a low risk.  *See id.*  The court concluded that the statute's reference to "consecutive assessments" is ambiguous because one may plausibly read the statute as requiring only two low scores (the initial determination and one reassessment).  *See id.*  The court, however, also deemed plausible

the BOP's interpretation, under which the initial determination would not be counted as one of the required "two consecutive assessments," because "at that point, there is no benchmark assessment to which the BOP could refer to measure whether a prisoner's risk of recidivism had increased, decreased, or stayed the same." *See id.* (citing *White v. Federal Bur. of Prisons*, 2023 WL 5950805, at *3 (D. Minn. Sept. 13, 2023)). Thus, even though the statute was ambiguous on this question of whether two or three assessments are required, the court concluded that it must defer (under *Chevron*) to the BOP's reasonable interpretation. *See id.*

The Court agrees with the *Padlilla* court that 18 U.S.C. § 3632(d)(4)(A)(ii) may plausibly be interpreted to require only one favorable (low or minimum) reassessment after a favorable initial determination in order for a prisoner to earn ETCs at the 15-day rate, and that the statute is at least ambiguous in that regard. As discussed, however, it does not appear that petitioner received *any* risk determination or assessment prior to April 2021, when the auto-calculation tool was implemented, and he has nonetheless been credited at the 15-day rate since July 2019. The statute calls for an initial determination and periodic reassessments, and BOP policy states that the first assessments will take place within 28 days and 180 days respectively. Therefore, for purposes of applying the statute, it appears that the BOP has in fact allowed petitioner to earn at the higher rate after only those two default assessment dates under the policy, after two assessment periods – which means that the BOP would have complied with the statute even under a two-score interpretation. If the BOP insists on creating an additional (fictional) assessment on the first day the FSA took effect (or the first day a prisoner's incarceration), to which the actual first PATTERN

12

score (determined with the auto-calculation tool) may be applied – thereby creating a third assessment date before the 15-day rate is applied – the Court must find in these specific circumstances that the BOP has reasonably applied the statute, because the 15-day rate has been used after only the mandated intervals for the initial determination and one periodic reassessment.   As discussed above, courts have consistently approved of the BOP's application of the 15-day rate based on using those two time intervals.   That reasonable application of the statute is entitled to *Chevron* deference by this Court.   *See Lopez v. Davis*, 531 U.S. 230, 242 (2001) (deferring to the BOP's reasonable interpretation of a statute).[5]

Accordingly, the Court will not disturb the BOP's calculation of petitioner's ETC credits, and the Court therefore denies the petition in its entirety.

IT IS THEREFFORE ORDERED BY THE COURT THAT the petition for habeas corpus under 28 U.S.C. § 2241 is hereby **denied**.

IT IS SO ORDERED.

Dated this 6th day of May, 2024, in Kansas City, Kansas.

/s/  John W. Lungstrum
Hon. John W. Lungstrum
United States District Judge

---

[5]  Thus, the Court need not and does not offer any opinion concerning whether the BOP's interpretation would be reasonable in the event that it required an initial determination and two subsequent reassessments in a particular case in which backdating had not been used and the three separate score calculations had actually taken place on the three separate dates.